UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Thomas M. Moulton</u>

    v.

<u>David Bane and Prime</u>           Civil No. 14-cv-265-JD
<u>Choice Enterprises, LLC</u>      Opinion No. 2015 DNH 206


    v.

<u>Thomas M. Moulton, et al.</u>

O R D E R


Thomas M. Moulton brought suit against David Bane and his company, Prime Choice Enterprises, LLC ("PCE"), after their business relationship failed.  In response, Bane and PCE brought counterclaims against Moulton and third-party claims against Eric Emery, King's Highway Realty Trust, Ltd. Partnership, and North Madison Hill LLC.  Moulton moves for summary judgment on some of his claims against Bane and PCE and on all of their counterclaims against him.  North Madison Hill LLC ("NMH") moves for summary judgment on the third-party claims against it.  Bane and PCE object.[1]

---

[1] In their objection, Bane and PCE assert that they are entitled to summary judgment on their counterclaims and third-party claims.  Affirmative motions for relief cannot be combined with an objection.  LR 7.1(a)(1).  Therefore, that part of the objection will not be considered.

Standard of Review

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute is one that a reasonable fact-finder could resolve in favor of either party and a material fact is one that could affect the outcome of the case." Flood v. Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir. 2015).  Reasonable inferences are taken in the light most favorable to the nonmoving party, but unsupported speculation and evidence that "is less than significantly probative" are not sufficient to avoid summary judgment.  Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 174 (1st Cir. 2015) (internal quotation marks omitted).

Background

The Meat House ("TMH") was a business that operated retail butcher shops through franchises.[2]  In 2013, Moulton made a loan to TMH and held a promissory note for the loan.  As part of the security agreements for the loan, individual shareholders of TMH signed "pledge agreements" through which Moulton would succeed

---

[2] Bane and PCE refer to The Meat House and related entities collectively as "the franchisor ('MHF')."  Moulton refers to The Meat House and its related entities by the initials "TMH".  To avoid confusion, the court will refer to The Meat House and related entities as "TMH".

to their voting rights in the company and "step in" to operate the company, called "step in rights," upon default on the promissory note.

By 2014, TMH was in financial distress.  It had defaulted on the promissory note to Moulton, which triggered Moulton's step in rights under the pledge agreements.  TMH had also defaulted on other obligations and was closing stores.

David Bane was a franchisee of TMH and opened a store in Summit, New Jersey, in 2012.  Bane learned in January of 2014 that TMH was in need of financial assistance.  Bane attempted, unsuccessfully, to acquire the assets of TMH through a deal with TMH principals and its lender, Centrix Bank.

In February of 2014, Bane and Moulton began discussions about working together so that Moulton could get the promissory note paid and Bane could acquire TMH's assets.  Both Moulton and Bane had an interest in keeping TMH out of bankruptcy.  On March 6, 2014, Moulton exercised his step in rights and assumed control of TMH.  Moulton appointed himself as COO and appointed Michael Rubin as CFO of an entity to manage TMH.

Moulton, Rubin, and Bane discussed forming a new company to operate TMH and discussed ownership of the new company, particularly Moulton's interest in the company.  In emails, Bane referred to their plans as the "Moulton deal."  Bane agreed to pay the amount of Moulton's TMH promissory note and agreed to

3

pay Moulton for certain expenses that Moulton would incur.
Moulton understood that he would have an ownership interest in
the new company formed to operate TMH.

At the same time, another franchisee of TMH was also
interested in working with Moulton to acquire TMH assets.  That
franchisee offered to buy out Moulton for the amount of his TMH
loan and his expenses.  Moulton turned down that offer because
it did not provide him an opportunity for an ownership interest
in the company that would operate TMH.

Bane formed PCE during March of 2014.  Eric Emery worked
with Bane in operating the new company.  Moulton was spending
money to preserve TMH's assets against efforts by other
creditors and landlords of TMH stores to seize assets.  Moulton
and Bane continued to discuss options for Moulton's investment
in and ownership share of PCE.

In March of 2014, Team Funding Solutions notified Centrix
Bank that it had a perfected security interest in the equipment
it had leased to TMH for the Stratham, New Hampshire, store.
Team Funding further asserted that its security interest took
priority over Centrix Bank's lien.  Ted Reynolds, the president
of Team Funding, states in his affidavit that in response to the
notice, Centrix Bank agreed that the equipment subject to Team
Funding's security interest would be excluded from the sale of
TMH's assets.

Rubin notified Bane on April 15, the day of the sale, that the equipment at the TMH store in Stratham, New Hampshire, was leased from Team Funding Solutions and Pawnee Leasing Corporation.  As a result, Rubin reported, Centrix Bank could not sell that equipment.

PCE acquired the TMH assets on April 15, 2014, through an Article 9 secured party sale conducted by Centrix Bank.[3]  Bane, as the sole shareholder in PCE, paid $790,000 through an Asset Purchase and Escrow Agreement ("Asset Purchase Agreement"). The Asset Purchase Agreement sold assets of several TMH entities and the equipment and furnishings owned by TMH at seven store locations.  The Asset Purchase Agreement also appended a subordination agreement between Centrix Bank and Team Funding Solutions that excluded from the sale equipment which had been leased to TMH for the Stratham, New Hampshire, store.

Eric Emery, who worked with Bane, was spending time on reopening the TMH stores for PCE.  Among other things, Emery was working to get PCE leases for the stores at the TMH locations in Scarborough, Maine, and Stratham, New Hampshire.

On April 17, 2014, Moulton, Rubin, and Bane exchanged emails about operating the business while Bane was on vacation

---

[3] The parties refer to the new company that Bane formed to acquire the TMH assets as "NewCo".  NewCo eventually became PCE. As the difference in name does not appear to be material, the court will refer to the company as PCE.

5

in Costa Rica.  Moulton and Rubin sent Bane the expenses they had incurred in their work for PCE, which irritated Bane.  While Bane was away, Moulton and Rubin worked on behalf of PCE to prepare to open stores, and Moulton provided office space for PCE.  Bane later acknowledged that it was helpful to have Moulton and Rubin working on the project.

On April 22, 2014, Bane sent Emery text messages in which Bane directed Emery to begin to separate from Moulton and Rubin. Bane expressed negative feelings and used derogatory terms about Moulton and Rubin.  Two days later, when Emery told Bane that the lease for the store in Stratham, New Hampshire, had not been finalized, Bane responded that he wanted the lease signed before he told Moulton that he would not get "deal stock."  Emery responded that "the guy" for the Stratham store was a close friend of Moulton's so that the deal was a "lock as of rt now."

Rubin advised Moulton not to enter into an agreement with Bane.  Rubin also offered ideas on how to structure the business arrangement with Bane to Moulton's advantage.

Bane on behalf of PCE paid Moulton $136,827.33 for the principal and interest on Moulton's loan to TMH pursuant the "Assignment Agreement," and PCE succeeded to Moulton's rights in TMH.  On April 27, 2014, Bane sent an email to Moulton telling him that Bane would handle the expenses going forward and asked for invoices and expenses.  On April 28, Rubin provided invoices

for $107,537.34 in expenses, which included attorneys' fees. Bane responded telling Rubin not to incur any more expenses and noting that there were too many lawyers working on the business.

By April 28, Bane had assembled a group of investors for PCE.  Under the investment plan, the investors would own all of the stock with Bane as the majority owner.  Moulton was not included in the group of investors.

Moulton sent Bane an email on April 29, 2014, to address the issues of expenses and the structure of the company.[4]  In the cited email, Moulton noted a breakdown in communication between them.  Moulton reiterated his expectations from their arrangement, which he acknowledged was not formalized in a memorandum of understanding.  His expectations were that his expenses would be paid and that he would be offered an opportunity to invest and receive an ownership interest in the company.  Moulton asked Bane to review the expenses and to present him with an offer to buy "deal stock."  Later in the day on April 30, Moulton questioned the amount of money Bane claimed

---

[4] While Moulton states that he sent his email on April 29, the document he cites (Kenney Decl. Ex. C at p. 2757) shows that the email was sent early in the morning of April 30 and refers to a text sent earlier by Bane.  That text apparently is not included in the chain.  Bane's email that Moulton identifies as his response to Moulton shows that it was sent on April 29, before Moulton's email, which suggests that it was not his response to Moulton.  Moulton offers no explanation for the chronological confusion.  Although Bane provides the same emails as exhibits to his objection, he does not address the chronology.

to have invested in PCE, $1.2 million, and suggested that he and Bane meet to discuss their perspectives on their business arrangement. Bane sent Moulton a list to show how he had invested $1.2 million in the business, and the list included a designation: "tom expenses 100000."

Moulton and Bane met on May 2, 2014. Bane informed Moulton that he would not get "deal stock" in PCE. He told Moulton that he could invest in PCE but would not get any special investment terms. Moulton declined the investment offer. Moulton continued to press to be paid for his expenses and told Bane that he would take the TMH stores in Stratham and Scarborough if he were not paid.

After learning that he would not be an investor in PCE, Moulton began plans to compete with PCE. Moulton began to operate NMH. Moulton told Bane that if Bane would transfer PCE's rights to the TMH stores in Scarborough and Stratham to NMH, he would waive collection of the expenses. That offer was not accepted.

Moulton then informed his friends, Steve Lopilato of Jenty, LLC and Mark Stebbins of Kings Highway Realty Trust Ltd., who were the landlords of TMH stores in Scarborough, Maine, and Stratham, New Hampshire, respectively, that he would not be involved in PCE after all. Lopilato had signed a lease with PCE for the store in Scarborough based on the representation that

Moulton would be involved in PCE and its operations.  Because of
Lopilato's relationship with Moulton, he had not required a
personal guaranty or financial statements.  When Moulton told
Lopilato that he would not be involved in PCE, Lopilato directed
Jenty's counsel to void the lease with PCE because it had been
signed based on false information.

    In mid-May, 2014, Moulton asked Emery to work for NMH.
Bane had made Emery an offer to work for PCE but had not
formalized his employment there.  Emery sent Bane a letter of
resignation on May 23, 2014.  Thereafter, Emery worked for NMH.

    Bane directed his counsel to negotiate with Team Funding to
have PCE buy the equipment at the Stratham store that TMH had
leased from Team Funding.  Bane's counsel discussed price with
Ted Reynolds of Team Funding.  Before they reached a deal,
however, Rubin contacted Reynolds about buying the equipment.
Under the terms set by Reynolds, on May 16, 2014, NMH paid
$30,000 to Team Funding for all of the equipment that had been
leased to TMH.  NMH also acquired the property that had been
leased to THM by Pawnee Leasing and Financial Pacific.

    On May 26, 2014, Lopilato, for Jenty, signed a lease
agreement with NMH for the Scarborough TMH store.  In June, NMH
signed a lease with King's Highway Realty Trust to rent the TMH
store in Stratham, New Hampshire.  NMH now operates retail
butcher stores at the Stratham and Scarborough locations.

Moulton filed suit against Bane and PCE on June 12, 2014. On July 8, 2014, Bane and PCE took the TMH assets from the Stratham store that were not subject to the leasing agreements. Because Bane did not do an inventory, he does not know whether he retrieved all of the TMH assets that were not subject to the equipment leases.  On the same day, PCE moved its belongings from Moulton's office and warehouse space.

In his amended complaint, Moulton alleges claims against Bane and PCE for breach of contract, promissory estoppel, fraudulent misrepresentation, breach of the implied covenant of good faith and fair dealing, violation of the New Hampshire Consumer Protection Act, RSA Chapter 358-A, quantum meruit, and unjust enrichment.  Bane and PCE allege counterclaims against Moulton for tortious interference, conversion, breach of the implied covenant of good faith and fair dealing, promissory estoppel, violation of RSA Chapter 358-A, and unjust enrichment. They allege third-party claims against NMH for tortious interference, conversion, violation of RSA Chapter 358-A, and unjust enrichment.  Bane and PCE also seek an injunction against Moulton and NMH to require them to turn over to PCE the TMH assets located at the Stratham store.

<u>Discussion</u>

Moulton moves for summary judgment on that part of his breach of contract claim seeking reimbursement of expenses, his promissory estoppel claim, his claims for quantum meruit and unjust enrichment, his claim of violation of RSA Chapter 358-A, and his claim of breach of the covenant of good faith and fair dealing.  He also seeks summary judgment on all of the counterclaims against him.  NMH moves for summary judgment on the third-party claims against it.  Bane and PCE object to the motion for summary judgment.[5]

A.   <u>Breach of Contract</u>

For purposes of summary judgment, Moulton contends that Bane and PCE agreed to reimburse him for his expenses in the amount of $100,000.  Moulton claims that Bane and PCE have breached their agreement by failing to pay him that amount. Bane and PCE argue that no contract to pay expenses was formed and that even if such a contract existed, Moulton is not entitled to recover.

Moulton argues that Bane agreed to reimburse Moulton for expenses he incurred in their joint business efforts.  Bane and PCE argue that the only contract that governed their

---

[5] Moulton and NMH filed a reply, and Bane and PCE filed a surreply.

11

transactions with Moulton was the Assignment Agreement through which PCE purchased the TMH loan from Moulton.  They contend that under the Assignment Agreement the parties agreed to pay their own expenses and that the integration clause precludes any other agreement about expenses.[6]  Bane and PCE, however, also acknowledge an obligation to pay Moulton's expenses.

"A valid, enforceable contract requires offer, acceptance, consideration, and a meeting of the minds."  Tessier v. Rockefeller, 162 N.H. 324, 339 (2011).  "A meeting of the minds requires that the agreement be manifest and based upon an objective standard."  Id.  Whether an unwritten contract has been formed is a question of fact.  Chase Home for Children v. N.H. Div. for Children, Youth & Families, 162 N.H. 720, 728 (2011).

Moulton supports his claim that Bane agreed to pay him $100,000 in expenses by citing Bane's deposition testimony that he had agreed to pay expenses and an email notation of PCE's

---

[6] As Moulton points out in his reply, the Assignment Agreement includes in Section 3 a requirement that PCE and Moulton would negotiate about payment of Moulton's costs and expenses incurred "in [his] attempts to collect the amounts owed to [him] under the Loan Documents and to preserve the value of the collateral securing such amounts," and the payment was due by June 1, 2014. Section 8, cited by Bane and PCE, provides that each party will be responsible "for all costs or expenses (including legal expenses) incurred by it with respect to the sale of the Purchased rights."  Section 8, therefore, has a limited focus, and does not appear to pertain to the expenses Moulton claims.

commitments that included an entry of $100,000 owed to Moulton. In response, Bane and PCE acknowledge that Bane intended to have PCE "reimburse Moulton for approved amounts expended for the benefit of PCE." They argue, however, that no agreement was ever reached as to the amount or what expenses were approved.[7]

As such, Bane and PCE concede that Bane agreed to reimburse Moulton for at least some expenses.[8] It is also undisputed that Bane and PCE have not paid Moulton for his claimed expenses. While Bane's email notation that Moulton was owed $100,000.00 for his expenses is some evidence of the amount due, Bane and PCE dispute that there was an agreement to pay that amount.

Therefore, Moulton is entitled to summary judgment on the breach of contract claim to the extent that Bane and PCE agreed

---

[7] Bane and PCE state: "After Moulton took control of [TMH], he obtained Bane's approval to pay certain expenses that would benefit PCE."

[8] They argue, however, that Moulton is not entitled to recover for breach of contract because he breached "any plausible agreement between the parties." In support, Bane and PCE cite their counterclaims for promissory estoppel, restitution, violation of RSA chapter 358-A, breach of the implied covenant of good faith and fair dealing, conversion, and tortious interference. Their theory is not sufficiently developed to permit review. See, e.g., Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) (explaining that the court is free to disregard arguments that are not adequately developed); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Further, because the listed counterclaims do not survive summary judgment, the theory is unpersuasive.

to pay at least some of his expenses.  The amount due, however, is disputed.

B.   Implied Covenant of Good Faith and Fair Dealing

Under New Hampshire law, the implied covenant of good faith and fair dealing applies in three different contractual contexts:  contract formation, termination of at-will contracts, and discretion in contract performance.  Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (1989).   In the context of contract formation, the covenant imposes "the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, in so far as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance on it."  Id.; see also Bursey v. Clement, 118 N.H. 412, 414 (1978). The covenant restricts a party's exercise of discretion in performing the contract when "the agreement ostensibly allow[s] to or confer[s] upon the defendant a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value."  Centronics, 132 N.H. at 144.

1.   Moulton's Claim

Without elaboration, Moulton states in his memorandum "[f]or the reasons stated above, the evidence of record shows

14

that Bane and PCE have breached the covenant, implied in every agreement," and quotes the standard from Bursey v. Clement. Based on his reliance on Bursey, Moulton appears to claim that Bane and PCE breached the implied covenant in the process of forming a contract with him.

Moulton provides no analysis of what agreement implied the covenant or how it was breached.  The court will not speculate about what necessary supporting arguments should be extrapolated from prior parts of Moulton's memorandum.  See Higgins, 194 F.3d at 260; Zannino, 895 F.2d at 17.

Therefore, Moulton has not shown that he is entitled to summary judgment on his claim that Bane and PCE breached the implied covenant of good faith and fair dealing.

### 2.  PCE's Counterclaim

Moulton also seeks summary judgment on the counterclaim that he breached the implied covenant of good faith and fair dealing.  The counterclaim, brought against Moulton by PCE, alleges that Moulton was subject to the implied covenant in his negotiations with PCE about his investment opportunity.  PCE further alleges that "by the wrongful conduct described above" Moulton breached the covenant.[9]  In support of summary judgment,

---

[9] The immediately preceding counterclaim alleges conversion. Absent explanation, the alleged unauthorized use of property does not appear to support breach of the implied covenant.

15

Moulton states that the basis of the claim is unclear and that PCE lacks evidence to support a claim that he breached the implied covenant.

In their objection to summary judgment, Bane and PCE state that Moulton breached the implied covenant during contract formation by representing that he would work cooperatively with Bane so that Moulton could collect his loan and Bane could save TMH.  After Moulton exercised his step in rights and took control of TMH, they assert, Bane agreed to pay Moulton for expenses incurred for the benefit of PCE.

Then, they contend, Moulton demanded payment for expenses that Bane never agreed to reimburse.  Based on that alleged sequence of events, Bane and PCE assert that Moulton's "misrepresentations" that he would work cooperatively with them induced them to enter into the Assignment Agreement and the Asset Purchase Agreement.

To the extent PCE intended to allege breach of the implied covenant in the formation of the agreement to reimburse Moulton for his expenses, the evidence PCE provides does not support the claim.  The record shows that Moulton did work cooperatively with Bane and PCE to the extent that Moulton exercised his step in rights, took control of TMH, and then sold his TMH loan to PCE, as the parties expected.  To the extent Moulton has demanded reimbursement for expenses outside of what Bane agreed

16

to pay, that does not appear to implicate the implied covenant in the formation of any agreement.

PCE also argues that "Moulton's misrepresentations about his intention to work cooperatively with Bane" induced Bane and PCE "to make substantial payments on two contracts, the Assignment Agreement . . . and the [Asset Purchase Agreement] with Centrix." As noted above, PCE has not shown a disputed material fact about Moulton's intent to work cooperatively and, therefore, has not shown a misrepresentation.[10]  Further, Moulton was not a party to the Asset Purchase Agreement.  Bane and PCE do not explain how Moulton could breach the implied covenant in forming a contract when he was not a party to that contract.

In the objection to summary judgment, PCE raises a new theory that Moulton breached the implied covenant in the performance of the Assignment Agreement.  PCE argues that because the Assignment Agreement did not impose requirements on Moulton for operating TMH, the agreement gave Moulton discretion to deprive PCE of the value of the agreement by taking the Stratham and Scarborough stores.

PCE did not allege a counterclaim of breach of the implied covenant in contract performance and did not seek leave to amend

---

[10] In particular, when Moulton and PCE entered the Assignment Agreement, Moulton expected to be part of PCE as an investor. PCE has not shown any misrepresentation made in contract formation.

to add that counterclaim.  See LR 7.1(a); Fed. R. Civ. P. 15(a).
Even if the new theory could be considered without amending the
counterclaim, PCE does not explain it with sufficient clarity to
avoid summary judgment.[11]

Moulton is entitled to summary judgment on the counterclaim
for breach of the implied covenant of good faith and fair
dealing.

C.   Promissory Estoppel

Promissory estoppel may impose liability only in the
absence of an enforceable contract.  Great Lakes Aircraft Co.,
Inc. v. City of Claremont, 135 N.H. 270, 290 (1992).  Under a
theory of promissory estoppel, "a promise reasonably understood
as intended to induce action is enforceable by one who relies
upon it to his detriment or to the benefit of the promisor."
Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 738 (1988).

---

[11] Under the Assignment Agreement, Moulton conveyed to PCE
Moulton's rights in TMH that Moulton held pursuant to a
promissory note and loan agreement with certain borrowers
associated with TMH.  PCE suggests that the implied covenant in
performance of the Assignment Agreement precluded Moulton from
competing with PCE.  It appears, however, that performance of
the Assignment Agreement concluded with the assignment of the
loan to PCE, which was performed.  PCE does not explain how the
Assignment Agreement governed Moulton's conduct after the
transaction was made and concluded.  To the extent Bane and PCE
suggest another theory in the surreply, based on discretionary
performance in incurring expenses, that effort is too little and
too late.

1.  <u>Moulton's Claim</u>

In his promissory estoppel claim, Moulton alleges that Bane promised he would have "an advantaged investment opportunity in PCE" for "deal stock," that he would be able to acquire additional shares at a discounted valuation, that Moulton and Rubin would be appointed to PCE's board of directors, and that Bane or PCE would reimburse Moulton for his expenses incurred "in connection with the collection of payment on the Note" and expenses incurred in PCE's operations after acquiring TMH's assets.  In response, Bane and PCE appear to dispute the terms of the investment opportunity and the expenses Moulton claims but not the promise that an advantageous opportunity would be available and the promise to reimburse at least some expenses.

Moulton is entitled to summary judgment in his favor on the promissory estoppel claim that Bane promised him an advantageous investment opportunity in PCE, failed to provide that opportunity, and in reasonable reliance on the promise Moulton paid PCE's expenses.  To the extent those expenses are recovered under breach of contract, however, they cannot also be recovered under promissory estoppel.  Therefore, the amount due cannot be resolved on summary judgment.

2.  Counterclaim

In their amended complaint, PCE and Bane allege that they reasonably relied on Moulton's "representations with respect to their dealings in connection with the Sale and the payment of $136,827 with respect to Moulton's lien."  They further allege that "Moulton's representations induced PCE to participate in the Sale and make efforts towards beginning operations at the locations in Stratham and Scarborough."  In their objection to summary judgment, PCE and Bane state that they relied on Moulton's representations that he would cooperate in PCE's attempt to save TMH but Moulton reneged on his promise when he decided not to invest and, instead, to pursue his own business opportunities.

The record facts do not support the promissory estoppel counterclaim.  Moulton did cooperate with Bane and PCE to save TMH from bankruptcy and sold the lien to Bane and PCE as planned.  Moulton then worked on behalf of PCE.  To the extent Bane and PCE rely on the transactions pursuant to the Assignment Agreement and the Asset Purchase Agreement to support the claim, those transactions were made under express contracts and are not subject to promissory estoppel.

Moulton decided not to invest when Bane did not offer him deal stock or an advantageous investment opportunity as Moulton believed had been intended.  Bane and PCE do not dispute that

Moulton was not offered an advantageous investment opportunity or that he decided not to invest when that opportunity was not available.  They also do not dispute that Moulton began to compete with Bane and PCE only after Bane notified him that he would not have deal stock or an advantageous investment opportunity in PCE.  Therefore, Bane and PCE have not shown disputed facts to save the claim, and Moulton is entitled to summary judgment on the promissory estoppel counterclaim.

## D.   Quantum Meruit and Unjust Enrichment

Parties may seek restitution under alternative theories, quantum meruit and unjust enrichment, when there is no claim for breach of contract.  Gen. Insulation Co. v. Eckman Constr., 159 N.H. 601, 611 (2010).  "A valid claim in quantum meruit requires that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment."  Id. at 612 (internal quotation marks omitted).  "A plaintiff is entitled to restitution for unjust enrichment if the defendant received a benefit and it would be unconscionable for the defendant to retain that benefit."  Id. at 611 (internal quotation marks omitted).

1.  <u>Moulton's Claim</u>

Moulton contends that he worked on behalf of Bane and PCE, with their knowledge and consent, by paying PCE employees and other expenses and by doing other business related activities. He states that he did that work based on his expectation that he would receive deal stock in PCE.  He further states that it would be unconscionable for Bane and PCE to retain the benefit of his services.  He seeks repayment of his expenses of $100,000, $14,796.75 as the fair rental value of the premises PCE used that were owned by Moulton, and the value of his time and Rubin's time while they worked on PCE's behalf in March and April of 2014.[12]

In response, Bane and PCE state that while they expected a benefit from buying Moulton's loan to TMH in the amount of $136,827.33, they did not receive any benefit.[13]  They argue that the help Moulton provided was to save TMH, particularly the Stratham and Scarborough stores, which are now operated by Moulton's company, NMH.  They do not address the rental of Moulton's building or the time Moulton spent on PCE.

---

[12] In his reply, Moulton provides evidence of the amount of time spent working on behalf of PCE.

[13] Bane and PCE argue in their surreply that Moulton cannot seek restitution on a claim governed by the Assignment Agreement.

To the extent Moulton seeks payment of expenses, that claim has been addressed by the breach of contract and promissory estoppel claims and cannot also be redressed by unjust enrichment and quantum meruit.  See Turner v. Shared Towers VA, LLC, 167 N.H. 196, 202 (2014).

It appears to be undisputed that PCE received a benefit of free use of Moulton's building from April 14 to July 8, 2014, which was not covered by a contract.  Therefore, PCE owes rent for that period of time.

The claim seeking restitution for time spent on behalf of PCE in March and April of 2014 is less clear.  Rubin is not a party in this case, and Moulton does not explain how he can recover the value of Rubin's time.  Moulton also does not provide sufficient detail to support his claim for payment for his own time.  Therefore, Moulton has not shown he is entitled to summary judgment on his unjust enrichment or quantum meruit claims as to time he or Rubin spent on behalf of PCE.

### 2.  Counterclaim and Third-Party Claim

In support of the counterclaim and third-party claim of unjust enrichment, Count VIII, PCE alleges only that Moulton and NMH "have received benefits which would be unconscionable and contrary to law for them to retain."  In their objection to summary judgment, Bane and PCE state that Moulton received a

benefit when PCE paid Moulton for the TMH loan under the
Assignment Agreement, and Moulton knew that the purpose of
buying the loan was for PCE to operate the Scarborough and
Stratham stores.  They then state in conclusory fashion that it
would be unconscionable for Moulton to retain the payment they
made under the Assignment Agreement.

Because that transaction was made pursuant to a contract,
the equitable remedy of restitution does not apply.  See Turner,
167 N.H. at 202; Coldwell Banker Real Estate, LLC v. Brian Moses
Realty, Inc., 752 F. Supp. 2d 148, 169 (D.N.H. 2010).
Therefore, Moulton and NMH are entitled to summary judgment on
the unjust enrichment counterclaim and third-party claim.

E.  Violation of RSA Chapter 358-A

New Hampshire's Consumer Protection Act, RSA Chapter 358-A,
provides that it is "unlawful for any person to use any unfair
method of competition or any unfair or deceptive act or practice
in the conduct of any trade or commerce within this state."  RSA
358-A:2.  Section 358-A:2 lists sixteen actions that fall within
its prohibition, but that is not an exhaustive list of such
methods, acts, or practices.  If the challenged conduct is not
listed in RSA 358-A:2, to be actionable it must satisfy the
"rascality test," meaning that the conduct "must attain a level
of rascality that would raise an eyebrow of someone inured to

24

the rough and tumble of the world of commerce." Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 675 (2013).

### 1. Moulton's Claim

In support of the motion for summary judgment, Moulton contends that Bane and PCE violated the Consumer Protection Act by making a false representation that Moulton "would be conferred an equity position in PCE" which induced Moulton to exercise his step in rights with TMH on behalf of PCE and to work for PCE's interests. Moulton further contends that Bane violated the Act by admitting he owed Moulton reimbursement for expenses but refusing to pay. Moulton augments his claim by citing anti-Semitic statements Bane made in emails. Bane and PCE contend that neither of them promised or formally agreed that Moulton would have an equity position in PCE.

The record evidence shows that while Moulton expected to get deal stock in PCE, based on discussions with Bane, there was no express agreement or memorandum of understanding about the terms of his interest in PCE. Even if such an agreement had existed, however, an ordinary breach of contract would be insufficient to support a claim under RSA Chapter 358-A. State v. Sideris, 157 N.H. 258, 262 (2008). As such, Moulton and NMH have not shown that the circumstances anent the investment opportunity in PCE meet the rascality test. Further, the record

25

pertaining to non-payment of Moulton's expenses does not show a violation of the Consumer Protection Act as a matter of law, as would be necessary to support summary judgment.

Therefore, Moulton is not entitled to summary judgment on his claim that Bane and PCE violated the Consumer Protection Act.

### 2.   Counterclaim and Third-Party Claim

Moulton and NMH also seek summary judgment on the counterclaim and third-party claim, Count VII, that they violated the Consumer Protection Act by their "wrongful conduct."  In response to the motion for summary judgment, Bane and PCE argue that Moulton is liable because he induced PCE to buy the TMH loan through the Assignment Agreement and then demanded payment for "bogus expenses."  They further state that after their relationship with Moulton soured, Moulton tried to reach a deal with Bane in which he would get possession of TMH stores while at the same time he was secretly taking steps to acquire the stores.

To the extent Count VII is based on a breach of the Assignment Agreement, it does not state a claim for violation of the Consumer Protection Act.  Taken in the context of the parties' relationship, the other conduct is not sufficiently egregious to satisfy the rascality test.  Bane and PCE have not

shown that a factual dispute remains to be decided at trial.
Therefore, Moulton and NMH are entitled to summary judgment on
Count VII.

F.   Conversion

To succeed on a claim of conversion under New Hampshire
law, a plaintiff must show that the defendant intentionally
exercised dominion or control over the plaintiff's property and
that the defendant's actions seriously interfered with the
plaintiff's right to the property. Muzzy v. Rockingham Cty. Tr.
Co., 113 N.H. 520, 523 (1973); accord Askenaizer v. Moate, 406
B.R. 444, 454 (D.N.H. 2009). "Among the factors that a court
must consider are the extent and duration of the exercise of
control over the goods, the intent to assert a right
inconsistent with the other party's right of control, and good
faith." Kingston 1686 House, Inc. v. B.S.P. Transp., Inc., 121
N.H. 93, 95 (1981).

Bane and PCE base their conversion counterclaim and third-
party claim, Count IV, against Moulton and NMH on equipment at
the Stratham store, which they contend PCE purchased pursuant to
the Asset Purchase Agreement (the Article 9 sale conducted by
Centrix Bank). Moulton and NMH move for summary judgment on the
ground that Bane and PCE cannot show that they own any equipment
located at the Stratham store because that equipment was subject

27

to defaulted leases which Moulton and NMH bought.  In response, Bane and PCE contend that they purchased all of the equipment at the Stratham store through the Asset Purchase Agreement, that Moulton and NMH cannot show that the equipment was leased or that the leases were in default at the time of the Asset Purchase Agreement, and that the Team Funding arrangement was a security interest and not a lease.[14]

The assets that Bane and PCE purchased under the Asset Purchase Agreement are provided in Section 2.1 of the Agreement. Section 2.1(a) is titled "Purchased Assets," which is a list of seven categories of assets and includes TMH's "interest in the personal property leases used in the Business, if any, including those listed on Schedule 2.1(a)(i) the ("Personal Property Leases") [sic] to the extent said leases are, by their respective terms and conditions, assignable."  Section 2.1(a)(i).  Schedule 2.1(a)(i), however, lists "none".  Further, Section 2.1(b)(iv) excludes "the Leases" from the assets purchased.

The purchased assets also include "equipment, machinery, furniture, fixtures, computers, software, office equipment,

---

[14] Bane and PCE argue in their surreply that Moulton and NMH are attempting to invalidate the Asset Purchase Agreement.  That appears to be a misunderstanding of the basis of the motion for summary judgment.

signs, supplies, spare parts and other items of tangible
personal property owned by [TMH] for the benefit of and/or used
in the Business and located within each of [TMH's] seven (7)
retail stores listed on Schedule 1, including the Equipment set
forth on Schedule 2.1(a)(ii) hereto (the 'Equipment')."  Section
2.1(a)(ii) (emphasis added).  By the terms of the Agreement,
those assets are limited to what was owned by TMH and did not
include leased equipment.  The "owned by [TMH]" limitation also
applies to Schedule 2.1(a)(ii).[15]

   The record evidence shows that TMH did not own but instead
leased most of the equipment for the Stratham store from Team
Funding Solutions, Pawnee Leasing Corporation, and Financial
Pacific Leasing Corporation.[16]  Moulton states in his declaration
that by March of 2014, TMH was in default on its equipment

---

[15] The lists attached to Schedule 2.1(a)(ii) are equipment
inventories for each of the TMH stores.  According to Moulton
and not disputed by Bane and PCE, the inventories were done by
TMH employees a year or two before the sale and did not indicate
what equipment was owned and what was leased.  Bane has not
distinguished between owned and leased equipment in Schedule
2.1(a)(ii).

[16] There apparently was some equipment at the Stratham store
that was not leased and was taken by Bane and PCE after NMH
leased the store.

leases.[17]   The leases required TMH to keep the leased property

free of liens and encumbrances and permitted the lessors to,

among other things, sell the leased equipment if the lessee,

TMH, defaulted.   In March of 2014, Team Funding notified Centrix

Bank that it had a security interest in the equipment it leased

to TMH, and Centrix agreed that Team Funding's equipment was

excluded from its Article 9 sale of TMH assets.

The subordination agreement between Centrix Bank and Team

Funding Solutions, pertaining to the assets at the Stratham

store, establishes that Centrix's liens on TMH assets were

subordinated to Team Funding's lien.   The equipment covered by

Team Funding's lien is provided in Schedule A to the

subordination agreement, a thirty-two page list of property

items.   Bane and PCE provide no evidence to counter the

subordination agreement, which is part of the Asset Purchase

Agreement.[18]

---

[17] Bane and PCE argue that there is a dispute as to whether the
leases were in default but provide no evidence to show that the
leases were not in default to counter Moulton's declaration.
They also challenge the Financial Pacific lease on the ground
that it was not signed and lacked payment terms but do not show
that they, therefore, own equipment that was purportedly leased
from Pacific Financial.   The issues of validity and default on
the leases are not disputed for purposes of summary judgment.

[18] The theory raised by Bane and PCE that the Team Funding
lease was not a true lease so that those assets were subject to
the sale under the Asset Purchase Agreement is refuted by the
subordination agreement.

Under the terms of the leases, the Team Funding and
Financial Pacific leases were not assignable, and the Pawnee
lease was assignable only with prior written consent of Pawnee.
Therefore, the equipment leased to TMH by Team Funding,
Financial Pacific, and Pawnee could not be sold to PCE through
the Asset Purchase Agreement.  Bane and PCE have not shown that
they bought those assets through the Asset Purchase Agreement or
otherwise.

Although Bane and PCE challenge the validity of the sales
of the leased assets to Moulton and NMH, their conversion claim
depends on their evidence that they own property at the Stratham
store.  They have not shown what property they own at the
Stratham store or that a factual dispute exists about their
ownership of that property.  Therefore, Moulton and NMH are
entitled to summary judgment on the conversion counterclaim and
third-party claim.

G.   Tortious Interference

"To establish liability for tortious interference with
contractual relations, a plaintiff must show that:  (1) the
plaintiff had an economic relationship with a third party; (2)
the defendant knew of this relationship; (3) the defendant
intentionally and improperly interfered with this relationship;
and (4) the plaintiff was damaged by such interference."  City

31

of Keene v. Cleaveland, --- N.H. ---, 118 A.3d 253, 259 (N.H. 2015) (internal quotation marks omitted).  To be actionable, the interference must be improper, meaning motivated by an improper purpose.  Nat'l Emp't Serv. Corp. v. Olsten Staffing Serv., Inc., 145 N.H. 158, 162 (2000); accord City of Keene, 118 A.3d at 259 ("Whether the alleged conduct is improper requires an inquiry into the mental and moral character of the defendant's conduct.) (internal quotation marks omitted).  To be wrongful, interference must "surpass[] the permissible bounds of rough-and-tumble business competition."  Cook & Companyinsurance Servs., Inc. v. Volunteer Firemen's Ins. Servs., Inc., 2015 WL 5458279, at *2 (D. Mass. Sept. 17, 2015).

A claim for tortious interference with a prospective contractual relationship requires proof that the defendant "induced or otherwise purposely caused a third person not to enter into or continue a business relation with another and thereby caused harm to the other."  Sarah's Hat Boxes, L.L.C. v. Patch Me Up, L.L.C., 2013 WL 1563557, at *13 (D.N.H. Apr. 12, 2013) (internal quotation marks omitted).  The interference also must be improper.  Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 229 F. Supp. 2d 70, 74 (D.N.H. 2002).  "[C]ertain types of conduct such as fraud or threats of physical violence ordinarily will be sufficient to support a claim for interference with a prospective contractual relationship, but the use of ordinary

means of persuasion or the exertion of limited economic pressure will not, by itself, be sufficient." Wilcox Indus. Corp. v. Hansen, 870 F. Supp. 2d 296, 307 (D.N.H. 2012).

Bane and PCE allege that Moulton and NMH tortiously interfered with PCE's signed lease for the Scarborough store and with PCE's prospective lease for the Stratham store.[19]  Moulton and NMH move for summary judgment on the grounds that Bane and PCE lacked a reasonable expectation of a lease for the Stratham store and that Moulton's interference with the leases was not improper.  Bane and PCE respond, arguing that Moulton's intentional and spiteful actions raise factual issues for trial.

Initially, Moulton worked on behalf of PCE, when he thought that he would have an ownership interest.  He assisted PCE in negotiations to lease the Scarborough and Stratham stores.  Moulton's assistance was based on his personal relationship with both of the landlords.  Further, Moulton's interest in PCE from

---

[19] In their amended answer, Bane and PCE also alleged that NMH tortiously interfered with their contractual relationship with Team Funding to buy the leased equipment and that Moulton tortiously interfered with Eric Emery's employment at PCE. Moulton and NMH sought summary judgment on all parts of the tortious interference claims.  Bane and PCE, however, do not object to summary judgment on the parts of the claim pertaining to Emery and Team Funding.  Therefore, Moulton and NMH are entitled to summary judgment on the tortious interference counterclaim and third-party claim based on relationships with Team Funding and Emery without further analysis.  See Instituto de Educacion Universal Corp. v. Great Lakes Higher Educ. Guaranty Corp., 126 F. App'x 1, 2 (1st Cir. 2005); Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995).

the beginning of his relationship with Bane was the opportunity
to be an investor and to be involved in the business.

Circumstances changed after Bane informed Moulton that he
would not get deal stock in PCE and would not have an
advantageous investment opportunity in PCE.  Moulton declined to
invest without the advantages that he had expected he would be
offered.  At that point, Moulton no longer worked on behalf of
PCE but instead became a competitor.

### 1. Scarborough Store

Lopilato of Jenty, the landlord for the Scarborough store,
would not have signed the lease with PCE without financial
statements and a personal guarantee but for Moulton's
involvement in the business.  When Moulton told Lopilato that
Moulton would not be involved with PCE, Lopilato instructed
Jenty's counsel to void the lease with PCE because it had been
based on the false information that Moulton would be involved in
the business.  Thereafter, Moulton's company, NMH, signed a
lease for the Scarborough store.  NMH now operates a store at
the Scarborough location.

Bane and PCE have not provided any evidence that Moulton's
interference with PCE's lease for the Scarborough store was
wrongful.  Moulton provided truthful information about his
relationship with PCE, which influenced Lopilato to have the

34

lease voided.  Further, Moulton was competing with PCE to operate the Scarborough store, and the record does not show conduct beyond business competition.[20]

### 2.  Stratham Store

Bane and PCE knew that their ability to lease the Stratham store was dependent on Moulton's friendship with Mark Stebbins, the owner of King's Highway Realty, the landlord.[21]  Before a lease was signed, however, Moulton informed Stebbins that he, Moulton, would not be involved in PCE.  As a result, King's Highway Realty did not enter into a lease with PCE for the Stratham store.  Instead, Stebbins granted NMH a lease.

Moulton did not misrepresent the circumstances to Stebbins or otherwise improperly influence the relationship with Bane and PCE.  By the time NMH leased the Stratham store, Moulton was no longer acting on behalf of PCE but instead was in competition with Bane and PCE.  PCE has not shown that Moulton and NMH were precluded from competing to obtain the lease.  Therefore, PCE

---

[20] Even assuming that Moulton harbored ill will against Bane and PCE, the record demonstrates that Moulton sought the Scarborough store for his own business purposes, not simply to thwart PCE's lease.

[21] Bane told Emery that he wanted to be sure to get the lease signed before he told Moulton that he would not get deal stock in PCE.

has not shown disputed facts as to whether Moulton's interference with the lease for the Stratham store was improper.

Moulton and NMH are entitled to summary judgment on PCE's counterclaim and third-party claim of tortious interference.

## Conclusion

For the foregoing reasons, the plaintiffs' motion for partial summary judgment (document no. 57) is **granted** in part and denied in part.

The motion is **granted** on the plaintiff's claims as follows:

Count I – breach of contract:  The defendants breached the agreement to pay at least some expenses, damages not determined;

Count II – promissory estoppel:  The defendants promised Moulton an advantageous investment opportunity in PCE, failed to provide that opportunity, and in reasonable reliance on the promise Moulton paid PCE's expenses.  To the extent those expenses are recovered under breach of contract, they cannot also be recovered under promissory estoppel.

Counts VI and VII – unjust enrichment and quantum meruit - PCE received a benefit of free use of Moulton's building from April 14 to July 8, 2014, which was not covered by a contract. PCE owes rent for that period of time.

36

The motion is **granted** on the defendants' counterclaims and third-party claims as follows:

Count I – tortious interference against Moulton;

Count III – tortious interference against NMH;

Count IV – conversion against Moulton and NMH;

Count V – breach of implied covenant of good faith and fair dealing against Moulton;

Count VI – promissory estoppel against Moulton;

Count VII – violation of RSA chapter 358-A against Moulton and NMH; and

Count VIII - unjust enrichment against Moulton and NMH.

The motion for partial summary judgment is otherwise **denied.**

The plaintiffs' claims that have **not** been decided are part of the breach of contract claim in Count I; fraudulent misrepresentation, Count III; breach of the implied covenant of good faith and fair dealing, Count IV; violation of RSA Chapter 358-A, Count V; and part of the unjust enrichment and quantum meruit claims in Counts VI and VII.

The defendants' request for preliminary and permanent injunctions, Count IX, was not addressed by the plaintiffs' motion for summary judgment.  The defendants' request for

injunctive relief, however, is based on their counterclaim and third-party claim of conversion in Count IV, which have been resolved on summary judgment against the defendants.  As a result, there is no current basis for the defendants' request for injunctive relief.

SO ORDERED.

Joseph A. DiClerico, Jr.
Joseph DiClerico, Jr.
United States District Judge

November 16, 2015

cc:  Jesse C. Ehnert, Esq.
     Anna B. Hantz, Esq.
     Michele E. Kenney, Esq.
     Deborah Ann Notinger, Esq.
     William B. Pribis, Esq.
     Ross H. Schmierer, Esq.
     Nathan P. Warecki, Esq.

38