UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Thomas M. Moulton

    v.                                    Civil No. 14-cv-265-JD
                                            Opinion No. 2016 DNH 058

David Bane and
Prime Choice Enterprises, LLC


O R D E R


Thomas M. Moulton brought suit against David Bane and his company, Prime Choice Enterprises, LLC ("PCE"), after their business relationship ended acrimoniously.  Bane and PCE brought counterclaims against Moulton and third-party claims against Eric Emery, King's Highway Realty Trust, Ltd. Partnership, and North Madison Hill LLC.  Following summary judgment, the counterclaims and third-party claims were dismissed and Moulton's claims were resolved in part.

Moulton's claims that remained for trial were fraudulent misrepresentation, breach of the implied covenant of good faith and fair dealing, and violation of the New Hampshire Consumer Protection Act.  The amount of damages for breach of contract, or alternatively, promissory estoppel also remained for trial.  The case was tried to the court on January 6 and 7, 2016.  The parties have submitted post-trial briefs.

I.  Preliminary Matters

        Before trial, Bane and PCE objected to Moulton's request in
his trial brief for an award of attorneys' fees premised on
Keenan v. Fearon, 130 N.H. 494 (1988).  The issue of attorneys'
fees is addressed at the end of the order.  During trial, Bane
and PCE raised issues of standing, accord and satisfaction,
estoppel, and waiver.  After the evidence was closed, counsel
for Bane and PCE moved to dismiss the Consumer Protection Act
claim, and both sides were heard on the motion.  In their post-
trial brief, Bane and PCE asked the court to exercise its
equitable powers on their behalf but did not address standing,
accord and satisfaction, estoppel, or waiver.  Those matters are
addressed as follows.

    A.  Standing

        One of the issues that was tried was the amount of expenses
owed to Moulton by Bane and PCE as damages for breach of
contract or, alternatively, promissory estoppel.  During trial,
counsel for Bane and PCE argued that Moulton lacked standing to
claim as damages the expenses incurred to protect the TMH assets
and to assist PCE because he did not pay the expenses
personally.  In their post-trial brief, Bane and PCE argue,
without raising standing, that they do not owe Moulton for the
expenses because he did not personally pay the expenses.

At trial, Moulton testified that the expenses were paid from a trust, the Fairview Nominee Trust.  Moulton contends that because the Fairview Nominee Trust is not a true trust, he actually paid the expenses.  Bane and PCE do not dispute that Moulton was liable for the expenses he incurred on behalf of Bane and PCE but contest Moulton's argument that payments from the trust are actually payments from him.

Moulton argues that under Dwire v. Sullivan, 138 N.H. 428, 431 (1994), Moulton, as the sole beneficiary of the Fairview Nominee Trust, controls the trust and allows the court to ignore the trust.  Because the trustees of a nominee trust have no power, the beneficiaries of a nominee trust, not the trust itself, engage in business activities.  Id. at 430-31. Therefore, Moulton asserts, payment from the trust was payment by Moulton, himself.

In response, Bane and PCE rely on In re Village Green Realty Tr., 113 B.R. 105 (Bankr. D. Mass. 1990), a case cited in Dwire.  The bankruptcy court in Village Green stated that because "the beneficiaries of a nominee trust have the exclusive power to direct the activities of the trustee, it makes sense to view the beneficiaries as the owners of the trust res" so that the beneficiaries, not the trust, engage in business activities. Id. at 114.  The bankruptcy court explained that the particular

3

functions and purposes of the trust would determine whether the trust was eligible for bankruptcy protection.  The court put the burden on the trustees and beneficiaries to show whether they were, individually, entitled to bankruptcy protection or whether the trust was protected.  Id. at 114-15.  Because Bane and PCE do not challenge the status of Fairview Nominee Trust or Moulton's role as beneficiary, Village Green provides no support for them.

Based on Dwire, Moulton, as the beneficiary of the Fairview Nominee Trust, controls the Trust and its resources.  Therefore, payment from the Trust is payment from Moulton.

To the extent Bane and PCE challenge Moulton's standing, the theory lacks merit.  Standing to bring a claim in federal court requires a showing that the plaintiff "has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013).  In this case, it has been determined through summary judgment that Bane breached his agreement to reimburse Moulton for expenses which Moulton incurred in preserving the TMH assets, facilitating the Article 9 sale of the assets, and supporting PCE.  Therefore, Moulton was injured when Bane failed and refused to reimburse the expenses that

4

Moulton had incurred.  The injury may be redressed by payment of
those expenses as damages.

In addition, aside from the effect of the nominee trust,
New Hampshire recognizes the collateral source rule.  See
Tamposi v. Denby, --- F. Supp. 3d ---, 2015 WL 5737132, at *36
(D. Mass. Sept. 30, 2015) (applying New Hampshire law).  "Under
that rule, if a plaintiff is compensated in whole or part for
his damages by some source independent of the tort-feasor, he is
still permitted to make full recovery against the tort-feasor."
Doreen W. v. MWV Healthcare Assocs., Inc., 937 F. Supp. 2d 194,
196 (D.N.H. 2013) (internal quotation marks omitted).

Therefore, to the extent the liabilities Moulton incurred
on behalf of Bane and PCE were paid by the trust, that would not
affect Moulton's claim.

B.  Affirmative Defenses

During trial, Bane and PCE raised affirmative defenses of
an accord and satisfaction, waiver, and estoppel that had not
been pleaded or previously raised in the case.  Moulton opposes
the defenses in his post-trial brief.  In their post-trial
brief, Bane and PCE do not address those defenses but instead
argue for the first time that they are excused from paying the
expenses, despite the summary judgment ruling, because Moulton
breached the negotiation requirement in the Assignment and

Assumption Agreement that governed the purchase of the TMH note
by PCE.

### 1.  Accord and Satisfaction, Waiver, Estoppel

After their relationship soured, Moulton offered Bane
proposals to resolve their differences.  He suggested that they
divide the TMH business and that he would take the TMH stores in
Scarborough and Stratham and Bane and PCE would have the
franchise operations.  Bane refused the offer on the ground that
the stores were more valuable than the franchising operations.
Moulton then reversed the offer, but Bane declined again.

Because Bane did not agree to either offer, no resolution
was achieved.  Moulton then leased the stores in Stratham and
Scarborough and bought the equipment at the Stratham store from
the lessor.  Moulton has opened butcher shops in both locations.

During trial, Bane and PCE argued that Moulton achieved the
results that he offered in the first proposal and, therefore,
that he is barred from recovering on his claims under theories
of an accord and satisfaction, estoppel, and waiver.  Bane and
PCE, however, now appear to have abandoned those defenses.
Moulton contends that Bane and PCE cannot raise the affirmative
defense of accord and satisfaction, because it was not pleaded,
and contends that accord and satisfaction, waiver, and estoppel
all fail on the merits.

Federal Rule of Civil Procedure 8(c) provides that "a party must affirmatively state any avoidance or affirmative defense, including:  accord and satisfaction" in the party's answer.  "As a general matter, unpleaded affirmative defenses are deemed waived."  Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 52 (1st Cir. 2015).  The court, however, may avoid the "raise-or-waive rule when equity so dictates and there is no unfair prejudice to any opposing party."  Id.  In addition, defenses not raised at critical stages of the proceedings, such as summary judgment, may be waived.  See United States v. Mottolo, 26 F.3d 261, 263 (1st Cir. 1994) ("At summary judgment on the issue of liability, unproffered affirmative defenses normally are deemed abandoned.")

In this case, Bane and PCE did not plead accord and satisfaction and did not offer accord and satisfaction, estoppel, or waiver as defenses in opposition to summary judgment.[1]  Bane and PCE also have not addressed the defenses in their post-trial brief and therefore have abandoned them.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); see also Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir.

---

[1] Bane and PCE did plead waiver and estoppel as affirmative defenses.

2010); Higgins v. New Balance Ath. Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999).

The circumstances here do not support an equitable exception to the raise-or-waive rule.  Therefore, the affirmative defenses of an accord and satisfaction, estoppel, and waiver are precluded because they were not raised in a timely fashion and were not sufficiently supported.[2]

### 2.  Defense to Liability for Breach of Contract

At trial, despite the summary judgment ruling in Moulton's favor on the breach of contract claim, counsel for Bane and PCE for the first time raised a defense that Bane and PCE were not liable on Moulton's claim of breach of contract because Moulton breached the Assignment and Assumption Agreement by failing to negotiate the amount of expenses.[3]  They argue that Moulton's breach bars him from recovering damages.  Moulton contends that the avoidance defense now raised by Bane and PCE is precluded because it was not pleaded and, furthermore, that it fails on the merits.

---

[2] As Moulton has demonstrated in his brief, the affirmative defenses would also fail on the merits.  Because Bane and PCE waived the defenses and also have not pursued the defenses post trial, it is not necessary to address them on the merits.

[3] Moulton and PCE entered the Assignment and Assumption Agreement on April 25, 2014, for the purpose of selling the TMH note to PCE.

Section 3 of the Assignment and Assumption Agreement provides as follows:

> Additional Purchase Price.  The parties acknowledge and
> agree that the Initial Purchase Price represents the
> principal amount due to the Assignor [Moulton] under the
> Loan Documents, that additional interest has accrued and
> continues to accrue and that the Assignor has incurred
> significant costs and expenses in [his] attempts to collect
> the amounts owed to [him] under the Loan Documents and to
> preserve the value of the collateral securing such amounts.
> Therefore, Assignee [PCE] and Assignor agree that they will
> negotiate promptly and in good faith an additional payment
> by Assignee to Assignor in respect of such costs and
> expenses, such payment to be made no later than June 1,
> 2014.

Bane and PCE assert that Moulton "refused" to negotiate the amount of the expenses.

The record shows, however, that Moulton and Rubin kept Bane apprised of the amount of expenses as they accrued, that they sought Bane's input about the expenses, that after the Assignment and Assumption Agreement went into effect Moulton provided Bane with another accounting of the expenses with invoices, and that Moulton met with Bane to discuss the expenses and other parts of their business relationship.  Therefore, the record does not support the charge that Moulton refused to negotiate the expenses and instead shows that Bane failed to question or challenge the amounts when they were presented or offer alternative valuations of the expenses he owed.  A party cannot be expected to negotiate against himself.

9

In addition, even if Moulton had failed to negotiate in good faith, which is not shown by the record, Bane and PCE are precluded from raising the issue now.  Bane and PCE rely on Tech. Plannning Int'l, LLC v. Moore N. Am., Inc., 2003 WL 21228642, at *2 (D.N.H. May 23, 2003), and Butler v. Balolia, 736 F.3d 609, 615 (1st Cir. 2013), to show that Moulton could not recover expenses when he refused to negotiate.  In both of the cited cases, however, the plaintiff brought claims of breach of an agreement to negotiate in good faith and the courts concluded that such claims were viable.  Bane and PCE did not bring a counterclaim for breach of the agreement to negotiate in good faith.  Instead, they are asserting, belatedly, that Moulton breached the agreement as a defense to Moulton's breach of contract claim.  Therefore, neither case supports the defense raised here by Bane and PCE.

As Moulton argues, an avoidance defense, such as the breach theory raised here by Bane and PCE, must be raised in the parties' responsive pleading.  Fed. R. Civ. Pro. 8(c)(1).  Bane and PCE did not include the breach theory as a defense in their answer.  Therefore, the defense fails on the merits and because it was not pleaded.

C.  Inherent Equitable Power

In their post-trial brief, Bane and PCE urge the court to exercise its inherent equity powers to overturn the summary judgment ruling that Bane and PCE owe Moulton expenses.  Citing Cia. Petrolera Caribo, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 428 (1st Cir. 1985), Bane and PCE argue that it is unfair to require Bane and PCE to pay the expenses because Moulton is running stores that would have been part of PCE.

In Cia. Petrolera, the plaintiff appealed summary judgment on several grounds, including an argument that the district court erred in holding that the equitable relief of divestiture was not available under the Clayton Act.  Id. at 406.  Based on statutory construction of § 16 of the Clayton Act, the appeals court concluded that "injunctive relief" was not as limited as the district court had found and that the Clayton Act did not restrict the court's inherent power to grant equitable remedies, including divestiture.  Id. at 428-29.

Cia. Petrolera does not apply here.  Bane and PCE are not seeking an equitable remedy.  Instead, they are asking the court to limit the remedy available to Moulton.  They contend that it would be unfair to allow Moulton to recover on his breach of contract claim, a determination that was made previously on

summary judgment, because he now controls the two stores that PCE hoped would be part of its business.

Bane and PCE first raised their equitable relief theory in their post-trial brief.  They did not plead a counterclaim for equitable relief or raise it as a defense to summary judgment.  The request for equitable relief is raised too late and is not persuasive.

    D.   Motion to Dismiss Consumer Protection Act Claim

Counsel for Bane and PCE argued after the close of the evidence that the Consumer Protection Act ("CPA") does not apply in this case because the claims arose from a dispute between businessmen.  Counsel also argued that the circumstances here do not support a CPA claim.  Counsel for Moulton pointed out that under New Hampshire law the CPA does apply in business disputes and argued that the conduct of Bane and PCE did violate the CPA.

A motion made at the close of the evidence in a jury-waived trial, asserting that the plaintiff's evidence is insufficient to sustain a claim, is governed by Federal Rule of Civil Procedure 52(c) and is known as a motion for judgment on partial findings.  See, e.g., Connor B. ex rel. Vigurs v. Patrick, 985 F. Supp. 2d 129, 156 (D. Mass. 2013).  In deciding a motion under Rule 52(c), the court draws "reasonable inferences and make[s] credibility determinations" from the testimony and

evidence presented at trial.  Diaz Aviation Corp. v. Airport
Aviation Servs., Inc., 716 F.3d 256, 263 (1st Cir. 2013).  The
court must make findings of fact and conclusions of law to
support the decision.  Fed. R. Civ. P. 52(c).

In their post-trial brief, Bane and PCE no longer contend
that the CPA does not apply to business disputes.  Indeed, the
CPA provides a private right of action to any person injured by
violations of the Act, including business entities.  George v.
Al Hoyt & Sons, Inc., 162 N.H. 123, 128 (2011).  Therefore, Bane
and PCE have not shown that the CPA is inapplicable because the
dispute involves business entities.

Bane and PCE also challenge the Consumer Protection Act
claim on the merits, asserting that the facts do not support a
ruling in favor of Moulton.  Moulton disputes that argument.
The challenge to the CPA claim on the merits is addressed in the
context of the court's findings and rulings below.

E.  Summary Judgment

In the summary judgment order entered in this case on
November 16, 2015, the court ruled that Bane and PCE breached
the agreement with Moulton to pay at least some of the expenses
Moulton incurred, that Bane and PCE also are liable for expenses
paid by Moulton under the claim for promissory estoppel, and

that Bane and PCE are liable under the claims for quantum meruit
and unjust enrichment for rent to cover the period of time PCE
used Moulton's building.  The amount of rent was undisputed, and
the amount owed is $14,796.75.

In his post-trial brief, Moulton cites the background
section of the summary judgment order to support proposed
findings.  For purposes of summary judgment, however, the court
determines whether a genuine dispute about a material fact
exists and whether the moving party is entitled to judgment as a
matter of law.  Fed. R. Civ. P. 56(a).  As such, the court
relies on the properly supported record provided by the parties
to decide the motion but does not make factual findings except
as provided by Federal Rule of Civil Procedure 56(g).

Therefore, the background section in the summary judgment
order does not provide the factual findings for deciding the
remaining claims in the case.  Those findings will be made by
the court based on the evidence presented at trial.

II.  <u>Findings of Fact</u>

The amount of expenses owed as damages was tried and is
addressed here.  In addition, Moulton's claims for fraudulent
misrepresentation, breach of the covenant of good faith and fair

dealing, and violation of the New Hampshire Consumer Protection Act were tried.  The court makes the following factual findings:[4]

1.  The Meat House operated retail butcher shops and a franchise business through a group of enterprises that are referred to collectively as TMH.

2.  David Bane was a franchisee of TMH and operated a butcher store under the TMH brand in Summit, New Jersey, beginning in 2012.

3.  Bane had previously worked on Wall Street and retired in 2010 from a hedge fund business.

4.  Thomas Moulton owned and operated a small construction company, a real estate business, and a manufacturing company, Sleepnet, that produced and sold products used in treating sleep apnea and respiratory problems.  Moulton's businesses were located in Hampton, New Hampshire.

5.  Michael Rubin was Chief Operating Officer and Chief Financial Officer of Sleepnet.

6.  Moulton leased property to TMH.

7.  In May of 2013, Moulton loaned $150,000 to TMH, secured by a promissory note and pledge agreements.

---

[4] Facts material to the fraudulent misrepresentation claim must be proven by clear and convincing evidence.  Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 369 (2009).  The remaining claims and issues are decided by a preponderance of the evidence.

8.   Under the terms of the note, TMH agreed that upon default TMH would pay Moulton the costs of collection, including attorneys' fees.

9.   Through the pledge agreements, TMH's individual stockholders granted to Moulton the right to succeed to their shares of voting rights in TMH and to step in to operate TMH in the event of default.

10.   By late 2013, TMH was in financial distress and had failed to make payments as required by the note.  Moulton hired an attorney to address repayment of the loan.

11.   Bane was interested in keeping TMH out of bankruptcy to protect the TMH franchise brand.

12.   Bane was also interested in acquiring the TMH assets, but his first attempt failed.

13.   Moulton was interested in keeping TMH out of bankruptcy to avoid having his note discharged.

14.   Moulton was also interested in the business opportunity that TMH might provide.

15.   In late February of 2014, Bane and Moulton agreed to work together to save TMH from bankruptcy and to develop a new business to run the TMH assets.

16.   Moulton wanted to get his note paid, and Bane wanted Moulton's assistance to acquire TMH's assets from its secured lender, Centrix Bank.

17.   Moulton and Bane agreed that Bane would form a new company to operate TMH by buying Moulton's promissory note and buying TMH's assets in an Article 9 sale through Centrix Bank.

18.   Moulton and Bane also agreed that Bane would reimburse Moulton for his expenses and provide Moulton with equity, which Bane called "Deal Stock," in the new company to be formed to operate TMH.

19.   Deal Stock was to be equity in the new company that Moulton would get, without additional monetary investment, because of his role in helping to put the deal together.   Deal Stock would provide Moulton with an ownership interest in the new business.

20.   Bane knew when he promised Deal Stock to Moulton that the availability of Deal Stock would depend on the valuation of the new company, but Bane did not explain that contingency to Moulton.

21.   In early March, TMH defaulted on the note, and Moulton began taking steps to exercise his step-in rights under the security agreements.

22.  Moulton agreed with Bane that he would exercise his step-in rights to take control of TMH and would assist Bane in acquiring the TMH assets from Centrix Bank.

23.  Bane knew that Moulton had lawyers evaluating the priority of Moulton's step-in rights in order to secure his priority and to facilitate Bane's acquisition of the TMH assets.

24.  On March 6, 2014, Moulton exercised his step-in rights and took control of TMH.

25.  Rubin and Moulton then managed TMH and worked to keep TMH out of bankruptcy, to prevent creditors and landlords from taking the assets, and to deal with dissatisfied franchisees.

26.  Another TMH franchisee, Kevin O'Donnell, offered to buy the TMH loan from Moulton and pay his expenses, but Moulton was not interested in that proposal because there was no opportunity for him to have an ownership interest in the business going forward.

27.  Moulton, Rubin, and Bane planned to meet for dinner on March 12.[5]

28.  On March 11 in anticipation of their meeting, Bane sent Moulton an email that provided three scenarios for structuring the new company.  In each of the scenarios, Moulton

_____

[5] The date of the meeting is somewhat unclear, but the exact date is not material.

18

would have at least 20% equity in the new company provided by deal stock, with some options for increasing his equity position.

29.  Bane told Moulton that Moulton's request for 45% equity in the new company through deal stock "got push back from the investors."

30.  Contrary to his representation to Moulton that he got push back from the investors, Bane never told the investors about Moulton or the agreement to give Moulton Deal Stock.

31.  After Moulton took control of TMH, TMH franchisees sent termination letters and other legal issues arose.

32.  Moulton paid the operational expenses for TMH and also incurred legal expenses in operating TMH and planning for a new company.

33.  Bane knew that Moulton, Rubin, and Moulton's lawyers were working on behalf of TMH and that Moulton was paying the costs of defending TMH, the costs of operating TMH, and the costs of preparing for the new company.

34.  Moulton, Rubin, and Bane continued to discuss plans for the new company that would be formed to operate TMH, and Bane continued to represent that Moulton would have Deal Stock in the new company.

35.   Bane knew that the termination of TMH franchises greatly reduced the value of the deal that Bane and Moulton had entered into so that the opportunity for Deal Stock was also greatly reduced, if it were available at all.

36.   Bane did not tell Moulton that the availability of Deal Stock would be reduced or that Deal Stock might not be available at all.

37.   At the end of March, Bane formed PCE to acquire the assets of TMH.

38.   Bane instructed Moulton and Rubin to continue to respond to default notices from franchisees and to legal action against TMH and to be sure that TMH did not incur liability in those matters.

39.   By early April, Bane decided that the amount of investment needed for PCE precluded Deal Stock, but he did not tell Moulton that Deal Stock would not be available.

40.   On April 4, 2014, Rubin proposed to Bane that Bane would pay the amount of the TMH note plus expenses at the time of the Article 9 sale of the TMH assets.

41.   Also on April 4, 2014, Rubin provided Bane with an estimate of expenses incurred to that point of $71,795.

42.  Bane responded that the amount of expenses was "fine" but said that he would like to delay payment of expenses until PCE was funded and could make the payment.

43.  Moulton and Rubin thought that Bane's response meant that there would be two categories of expenses: expenses incurred in TMH "debt collection" and expenses incurred on behalf of the new company that became PCE.  Moulton and Rubin thought Bane intended to delay only the expenses incurred for PCE, not the debt collection expenses, and agreed to that delay.

44.  Bane thought of the expenses as a single entity, not divided between debt collection and new company expenses, and thought that Moulton and Rubin had agreed to let him pay all of the expenses after the new company was formed and funded.

45.  Rubin worked with lawyers to arrange the Article 9 asset sale for PCE.

46.  On April 15, 2014, PCE acquired TMH's assets for $790,000 at an Article 9 sale conducted by Centrix Bank.

47.  Bane did not reimburse Moulton for any expenses or purchase the TMH note at that time.

48.  Eric Emery, a former TMH employee, began to work with Bane on PCE.

49.  Moulton was concerned that Bane had purchased the TMH assets but had not purchased the TMH loan or paid expenses, leaving Moulton with TMH's liabilities without its assets.

50.  Bane planned to leave on April 18 for a week-long family vacation in Costa Rica.

51.  On April 17, Moulton asked Bane to pay him for the TMH note and the expenses before Bane left and also said that he wanted to finalize their arrangement concerning PCE, including the Deal Stock, during the week after Bane got back.

52.  Also on April 17, Rubin sent Bane an email with an itemization of the expenses, separating the costs for debt collection from the costs related to PCE.

53.  Bane reassured Moulton that the deal would work out and that Moulton need not be anxious.

54.  Moulton expected that Bane would pay the debt collection expenses when he bought the TMH note.

55.  The only item of the expenses Bane challenged was the amount for salary paid to Rubin.

56.  Bane left for vacation on April 18 without buying the TMH note or paying any expenses.

57.  During his vacation, Bane was irritated by communications from Moulton and Rubin about buying the note and

22

paying expenses because he did not want to work with them while vacationing.

58.  Bane communicated with Emery about work while on vacation, which amounted to 231 emails and text messages, while there were only three emails with Moulton.

59.  On April 22, while on vacation, Bane told Emery to begin to separate from Moulton and Rubin and to do as much as possible without including them.  Bane made several anti-Semitic remarks aimed at Moulton and Rubin.

60.  Bane also told Emery that there would be no Deal Stock for Moulton and that the "joke" would be on Moulton and Rubin.

61.  Bane instructed Emery not to let Moulton know that he would not get Deal Stock.

62.  While Bane was away, Moulton and Rubin continued to work on behalf of PCE and continued to pay expenses and payroll for PCE.

63.  Bane told Emery not to tell Moulton that Bane would be in New Hampshire after he returned from vacation and instructed Emery to get a lease agreement for the TMH store in Stratham, New Hampshire, with a landlord who was a friend of Moulton's before Moulton was told he would not get Deal Stock.

64.  Under the Assignment and Assumption Agreement dated April 25, 2014, PCE purchased the TMH note and voting rights

23

agreements from Moulton for $136,827.33.  That amount satisfied, the principal due on the note.  The additional payment for costs and expenses were due no later than June 1, 2014.

65.  On April 27, Bane asked Moulton to send invoices for the expenses so that Bane could pay Moulton.

66.  On April 28, Rubin sent Bane an accounting of the expenses, with invoices, for expenses totaling $107,537.34.

67.  In response, Bane told Rubin not to incur more expenses and that there were too many lawyers "on the clock."

68.  In further communications, Bane acknowledged that he owed Moulton $100,000 in expenses.

69.  Bane and Moulton met on May 2 to discuss their plans.

70.  Bane told Moulton that he would not get Deal Stock in PCE but offered him the opportunity to invest on the same footing with other investors.

71.  Moulton declined Bane's offer and proposed that they part ways by dividing the PCE (formerly TMH) assets.

72.  Moulton first proposed that Bane would not pay the expenses he owed and instead would keep the franchising part of the business, while Moulton would take the stores in Scarborough and Stratham.  Bane rejected that offer on the ground that the stores were more valuable than franchising.

24

73.  Moulton then reversed the offer and proposed that Bane keep the stores and not pay the expenses and Moulton would take franchising.  Bane rejected that offer too.

74.  On May 16, Bane told Emery that he owed Moulton for the expenses and planned to pay them but was waiting to see "how much bs he causes."

75.  As determined on summary judgment, Bane and PCE owe Moulton rent in the amount of $14,796.75, for the office space used by PCE.

76.  Moulton ultimately arranged to lease the Stratham and Scarborough stores and opened his own butcher stores at those locations under the name Great East Butcher Company.

III.  <u>Rulings of Law</u>

The amount of damages owed on the breach of contract claims or, alternatively, on the promissory estoppel claim was tried. The claims presented at trial were Moulton's claims against Bane and PCE for fraudulent misrepresentation, breach of the implied covenant of good faith and fair dealing, and violation of the New Hampshire Consumer Protection Act.  The following rulings resolve the remaining issue and claims.

A.  Damages for Breach of Contract and Promissory Estoppel

Moulton was granted summary judgment on his breach of contract and promissory estoppel claims, which sought the expenses that Moulton paid to support their joint business venture.[6]  The issue that was tried was the amount of expenses to be awarded as damages.

Bane and PCE agreed to reimburse Moulton for the expenses he incurred to collect the TMH loan, to protect the TMH assets, and to set up and operate PCE.  Moulton asks that damages be awarded in the amount of $99,137.34.  That figure is the amount of the expenses incurred, $107,537.34, less $6,500 for Rubin's time, and $1,900 taken off of the bills from the law firm, Hoefle, Phoenix, Gormley, & Roberts, P.A.

In their post-trial brief, Bane and PCE argue that Bane only agreed to pay the out-of-pocket costs of running the TMH stores and did not agree to pay the legal fees Moulton incurred in collecting the loan and protecting the TMH assets.  The record, however, shows that Bane was informed of the expenses as they accrued and the purpose for which they were being incurred, and that he agreed to pay all of the expenses, including legal fees, that Moulton incurred.  He also acknowledged that he owed

---

[6] Because Moulton can recover the damages only once, the amount of damages for the two claims is decided together.

26

Moulton $100,000 in expenses.  Therefore, Bane and PCE are liable for the expenses Moulton incurred in the amount of $99,137.34.

   B.  <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

   Under New Hampshire law, the implied covenant of good faith and fair dealing applies in three different contractual contexts:  contract formation, termination of at-will contracts, and discretion in contract performance.  Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (1989).  In the context of contract formation, the covenant imposes "the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, in so far as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance on it."  Id.; see also Bursey v. Clement, 118 N.H. 412, 414 (1978). The covenant also restricts a party's exercise of discretion in performing the contract when "the agreement ostensibly allow[s] to or confer[s] upon the defendant a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value."  Centronics, 132 N.H. at 144.

Moulton contends that Bane misrepresented that Moulton would have Deal Stock for the purpose of inducing him to agree to exercise his step-in rights to take over TMH, to preserve the value of TMH assets, and to facilitate PCE's acquisition of the TMH assets.  Moulton also argues that during their business relationship Bane improperly exercised his discretion to deprive Moulton of Deal Stock.  As is explained in more detail in context of the claims for fraudulent misrepresentation and violation of the CPA, the evidence supports Moulton's claims. The damages Moulton seeks, however, are the same expenses that he has been awarded under his breach of contract and promissory estoppel claims.

Therefore, although Bane and PCE are liable for breach of the implied covenant of good faith and fair dealing, no additional damages are awarded.

## C.  Fraudulent Misrepresentation

Moulton's fraud claim is that at the beginning of their relationship Bane knowingly or recklessly promised Moulton Deal Stock, in exchange for Moulton's work to preserve TMH's assets and to facilitate the sale of the assets to Bane's new company and for paying expenses on behalf of their business venture. Moulton contends that he justifiably relied on Bane's misrepresentations that he would be given Deal Stock and in

28

reliance he did the work as agreed and incurred expenses.  As such, Moulton's claim is that the fraud induced Moulton to participate in the business venture with Bane.

To prove fraud under New Hampshire law, the plaintiff must show that the defendant made a fraudulent misrepresentation to him "for the purpose of inducing [him] to act or to refrain from action in reliance" on the misrepresentation and that he justifiably relied on the misrepresentation. Tessier v. Rockefeller, 162 N.H. 324, 331-32 (2011).  A misrepresentation is made fraudulently if it is "'made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation.'" Id. at 332 (quoting Patch v. Arsenault, 139 N.H. 313, 319 (1995)); see also Manchester Bank v. Conn. Bank & Tr. Co., 497 F. Supp. 1304, 1316-17 (D.N.H. 1980) ("And if a false statement is made recklessly with a conscious indifference to its truth and without considering whether it is true or false, its fraudulent charter is made out." Citing Saidel v. The Union Assurance Society, 84 N.H. 232, 149 A. 78, 80 (1930)). In addition, "a representation which was true when made could be fraudulent if the maker failed to disclose the subsequent information which made the original representation a false one." Manchester Bank, 497 F. Supp. at 1316.

The standard for justifiable reliance is subjective,
"'based on the plaintiff's own capacity and knowledge.'"
Trefethen v. Liberty Mut. Group, Inc., 2013 WL 2403314, at *7
(D.N.H. May 31, 2013) (quoting Smith v. Pope, 103 N.H. 555, 559
(1961)).  Fraud must be proved by clear and convincing evidence.
Hair Excitement, 158 N.H. at 369.

The evidence at trial shows that Bane offered Moulton Deal
Stock as part of their initial agreement to work together and
called their arrangement "operation 50%."  Bane offered Deal
Stock, which was something unfamiliar to Moulton, to induce
Moulton to enter the business arrangement that would allow Bane
to acquire TMH's assets.  Bane bolstered his initial
representations by providing three scenarios about the amount of
Deal Stock that Moulton would have in amounts that ranged from
20% to 40%.  Bane falsely told Moulton that he would not be able
to have a 45% ownership of the new company through Deal Stock
because that amount had elicited "push back" from the investors.[7]

Bane knew when he promised Deal Stock to Moulton that he
could not provide Deal Stock until he knew the valuation of the
new company.  He did not tell Moulton that any Deal Stock
depended on the valuation of the new company.  Instead, he

---

[7] In fact, Bane had not told the investors about the Deal
Stock plan or even that Moulton was involved in the new company.

continued to reinforce his initial promise that Moulton would get Deal Stock.

The evidence shows, clearly and convincingly, Bane promised Moulton Deal Stock when Bane knew he could not make that promise.  Bane represented to Moulton that he would have a substantial ownership interest in the new company, through Deal Stock, when he knew that ownership could not be determined until the investment and valuation of the new company were complete. As such, Bane was at least reckless, that is, consciously indifferent to the truth of his representations to Moulton about Deal Stock, and Bane made those false representations to induce Moulton's participation in the business venture.

Based on Bane's representations that Moulton would receive Deal Stock in the new company, Moulton entered the business venture with Bane, worked on behalf of Bane and PCE, provided office space for PCE, facilitated the sale of TMH's assets to Bane, and incurred expenses.  Moulton's reliance on Bane's representations was justified.

Therefore, the court finds and rules that Moulton has proved his claim of fraudulent misrepresentation against Bane and PCE.  Because Moulton seeks the same damages that were awarded for breach of contract, no additional damages are awarded.

D.  Violation of the New Hampshire Consumer Protection Act

Moulton's claim that Bane and PCE violated the CPA is broader than the claim for fraudulent misrepresentation. Moulton's claim under the CPA includes the theory of fraud in the inducement, as in the fraudulent misrepresentation claim, but also extends to Bane's continuing conduct through the business relationship.  Moulton contends that Bane promised him Deal Stock and then intentionally deceived him about Deal Stock, until the relationship terminated, while Bane either never intended to provide Deal Stock or knew that he lacked the information to promise Deal Stock.  Bane and PCE argue that the record shows only ordinary business dealings and that circumstances changed so that Deal Stock could not be part of the arrangement.

New Hampshire's Consumer Protection Act, RSA Chapter 358-A, provides that it is "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  RSA 358-A:2.  The CPA provides a private right of action to any person injured by violations of the Act, including business entities.  George, 162 N.H. at 128.

Section 358-A:2 lists sixteen actions that fall within its prohibition, but that is not an exhaustive list of prohibited

methods, acts, or practices. ACAS Acquisitions (Precitech) Inc. v. Hobert, 155 N.H. 381, 402 (2007). If the challenged conduct is not listed in RSA 358-A:2, to be actionable it "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 675 (2013). Claims under the CPA must be proved by a preponderance of the evidence. See Town of Wolfeboro v. Wright-Pierce, Inc., 2014 WL 1976629, at *5 (D.N.H. May 15, 2014); eClipse Enter. Solutions, LLC v. EndoCeutics, Inc., 2012 WL 3688510, at *4 (D.N.H. Aug. 27, 2012).

An ordinary breach of contract is not sufficient to meet the rascality test necessary to show a violation of the CPA. George, 162 N.H. at 129. On the other hand, a defendant who induces the plaintiff "to enter a contract based on a knowing misrepresentation of the promisor's intent to perform under the contract violates [the Consumer Protection Act]." Derry & Webster, LLC v. Bayview Loan Servicing, LLC, 2014 WL 7381600, at *6 (D.N.H. Dec. 29, 2014) (citing George, 162 N.H. at 675); see also Beer v. Bennett, 160 N.H. 166, 171-72 (2010). Similarly, misrepresentations made by a defendant in an ongoing effort to avoid performing under an agreement, when the defendant did not intend to perform, also violate the CPA. State v. Sideris, 157

33

N.H. 258, 263 (2008); State v. Moran, 151 N.H. 450, 454 (2004);
see also Butler v. Moore, 2015 WL 1409676, at *94 (D. Mass. Mar.
26, 2015) (decided under Massachusetts CPA).[8]

As discussed in the context of the fraudulent
misrepresentation claim, Bane misrepresented to Moulton that he
would get Deal Stock to induce Moulton to agree to their
business venture.  After the initial decision to work together,
Bane continued to represent that Moulton would get Deal Stock.
By early April, Bane had decided that the amount of investment
in PCE would not allow Deal Stock because of the valuation of
the company.  He did not inform Moulton of the change of plans
because Moulton had not yet facilitated sale of the TMH assets
to PCE and because Moulton was working on behalf of PCE,
including paying expenses and providing office space for PCE.
Bane knew that Moulton expected Deal Stock and was continuing to
work on behalf of PCE based on that expectation.

On April 22, Bane told Emery that Moulton would not get
Deal Stock, that Emery should conceal that decision from
Moulton, and that the "joke" would be on Moulton and Rubin.
Bane did not tell Moulton that he would not get Deal Stock until

---

[8] The New Hampshire Supreme Court has relied on the
Massachusetts CPA and cases interpreting the Act for guidance.
See Remsburg v. Docusearch, Inc., 149 N.H. 148, 160 (2003).

May 2, when their business relationship had frayed to the point of breaking.

Bane concealed the Deal Stock decision from Moulton so that Moulton would continue to work on behalf of PCE, which included facilitating the sale of the TMH assets to PCE, paying expenses for PCE, using his influence to obtain store leases, maintaining operations while Bane vacationed, and providing office space to PCE.  By concealing his decision not to give Moulton Deal Stock, as he had agreed to do, while reaping the benefits of Moulton's efforts that were based on the expectation of Deal Stock, Bane violated the CPA.

    E.   Application of the Consumer Protection Act

"If the court finds for the plaintiff [in an action brought under RSA chapter 358-A], recovery shall be in the amount of actual damages or $1,000, whichever is greater."  RSA 358-A:10, I.  "In addition, a prevailing plaintiff shall be awarded the costs of the suit and reasonable attorney's fees, as determined by the court."  Id.; see also State v. Mandatory Poster Agency, Inc., --- N.H. ---, 126 A.3d 844, 848 (2015).  "If the court finds that the use of the method of competition or the act or practice was a willful or knowing violation of this chapter, it shall award as much as 3 times, but not less than 2 times, such amount."  RSA 358-A:10, I.

35

Moulton seeks as actual damages the expenses he paid in reliance on the promise of Deal Stock, including the rent for office space provided to PCE, which total $113,934.09.  Moulton also seeks an award of costs, including attorneys' fees.  In addition, Moulton contends that Bane and PCE acted willfully or knowingly and asks the court to treble the damages award.  Bane and PCE contend that they did not violate the CPA and that the lack of Deal Stock was the result of a change in circumstances. They do not address the issue of multiple damages.

Bane did not inform Moulton about the true nature of Deal Stock or that he had changed his mind about Deal Stock.  By early April, Bane had decided that the valuation of PCE would not support Deal Stock.  Bane knew that the Deal Stock promise was important to Moulton and motivated him to continue in their business arrangement but failed to keep Moulton apprised of the investment situation in PCE and Bane's decision about Deal Stock.  At least by April 22, Bane intended to mislead Moulton into thinking that Deal Stock continued to be part of their arrangement when he did not intend to provide Deal Stock.[9]

---

[9] At trial, Bane testified that he could have given Moulton Deal Stock, although it would have been a small amount.  He acknowledged that when they met in May he told Moulton he would not get Deal Stock, even though Bane could have provided Deal Stock.

36

Bane expressed his intent to deceive Moulton in his communications with Emery while he was in Costa Rica.  Bane wrote that the "joke" about no Deal Stock would be on Moulton and Rubin.  Bane explained to Emery that the deception about Deal Stock was necessary so that Moulton would continue to work on behalf of PCE.  The angry tone of Bane's communications about Moulton with Emery and the lack of information provided to Moulton reinforce the evidence of Bane's intent to deceive Moulton.[10]  When Bane returned from vacation, he continued to deceive Moulton about the true state of affairs and did not divulge the truth about the Deal Stock until Moulton insisted on a meeting.

The court finds and rules that Bane's misrepresentations and material omissions to Moulton about Deal Stock were knowing uses of deceptive acts in the conduct of commerce within New Hampshire in violation of the CPA, RSA 358-A:2.

---

[10] Bane attempts to explain his remarks as the result of excusable irritation that Moulton and Rubin were interrupting his vacation.  He blames the situation, at least in part, on his wife, whom he says was unhappy that he was working rather than vacationing.  The record shows, however, that Bane chose to leave on a week's vacation at a crucial time in the development of the business and that he expected Moulton and Rubin, along with Emery, to manage his business affairs while he was gone. Although he asserts that he did not have time to communicate with Moulton and Rubin about business matters, the record shows that he spent considerable time communicating with Emery about plans to exclude Moulton and Rubin from the agreed arrangement.

37

When a defendant knowingly uses deceptive acts in commerce in this state, there is a mandatory minimum award of at least double damages.  RSA 358-A:10, I; George, 162 N.H. at 138.  The New Hampshire Supreme Court has not defined the method for determining whether to award double or treble damages.  In other cases, the damages multiplier under consumer protection statutes generally depends on the nature of the defendants' actions. See, e.g., AngioDynamics, Inc. v. Biolitec AG, 780 F.3d 429, 437 (1st Cir. 2015); Ocean Spray Cranberries, Inc. v. PepsiCo., Inc., 160 F.3d 58, 62 (1st Cir. 1998); Gabriel v. Jackson Nat'l Life Ins. Co., 2015 WL 1410406, at *21 (D. Mass. Mar. 26, 2015); B & R Produce Packing Co., Inc. v. A & H Farms, Inc., 2014 WL 576210, at *3 (D.N.H. Feb. 11, 2014); Mattress Discounters Gr., LLC v. Maximum Inv. LLC, 2011 WL 5827309, at *1 (D.N.H. Oct. 19, 2011); Polycarbon Indus., Inc. v. Advantage Eng'g, Inc., 260 F. Supp. 2d 296, 307 (D. Mass. 2008).

In this case, the court finds and rules that double damages is an appropriate award.  Therefore, Moulton is entitled to $227,868.18 in damages against Bane and PCE for violating the CPA.

In addition, under RSA 358-A:10, I, Moulton is entitled to the costs of the suit, including attorneys' fees.[11]  New Hampshire law controls the calculation of an award of the costs of the suit when, as here, the award is based on a New Hampshire statute.  See Town of Barrington v. Townsend, 164 N.H. 241, 250 (2012).  Moulton shall file a motion for the costs of the suit in accordance with the legal standard for awarding costs, under New Hampshire law, accompanied by appropriate and detailed evidentiary support.

Conclusion

For the foregoing reasons, the defendants' motion, under Rule 52(c), to dismiss the CPA claim is denied.

The court finds and rules that Moulton is entitled to $99,137.34 in damages on his breach of contract claim (Count I) and promissory estoppel claim (Count II) and to $14,796.75 in damages on his quantum meruit claim (Count VI) and unjust enrichment claim (Count VII) against Bane and PCE.

The court finds and rules in favor of Moulton on his claim for fraudulent misrepresentation (Count III) and his claim for breach of the implied covenant of good faith and fair dealing

---

[11] Because attorneys' fees are awarded under RSA 358-A:10, the court need not address Moulton's request for fees under Keenan v. Fearon, 130 N.H. 494 (1988).

(Count IV) against Bane and PCE.  Moulton seeks the same damages in Count III and Count IV as are awarded on Counts I, II, VI, and VII.  Therefore, no additional damages are awarded on Counts III an IV.

The court finds and rules in favor of Moulton on his claim against Bane and PCE for violation of RSA 358-A:2 (Count V). The damages awarded are $227,868.18.

Because the damages awarded for violation of RSA 358-A:2 encompass the damages awarded for Counts I, II, VI, and VII, the total amount of damages awarded is $227,868.18.

Moulton also is entitled to an award of the costs of the suit, including attorneys' fees, under RSA 358-A:10.

Moulton shall file a motion for an award of costs under 358-A:10, as provided in this order, **on or before April 11, 2016.**  Bane and PCE shall file their response within **fourteen days from the date the motion is filed**.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph DiClerico, Jr.
United States District Judge

March 21, 2016
cc:  Anna B. Hantz, Esq.
     Michele E. Kenney, Esq.
     Deborah Ann Notinger, Esq.
     Richard Roth, Esq.
     William B. Pribis, Esq.
     Nathan P. Warecki, Esq.